In re Claims of Lamont P. HEILMAN and John D. Schultz

v.

UNITED DRESSED BEEF COMPANY.

UNITED DRESSED BEEF COMPANY, Relator,

v.

DEPARTMENT OF EMPLOYMENT SERVICES, Respondent.

No. 48251.

Supreme Court of Minnesota.

Nov. 3, 1978.

Faegre & Benson and Dale E. Beihoffer, Minneapolis, Tate, Bruckner & Sykes and Kevin C. Berens, Lincoln, Neb., for relator.

Warren Spannaus, Atty. Gen., Richard B. Allyn, Sol. Gen., Peter C. Andrews, Asst. Atty. Gen., Frank Levin, Sp. Asst. Atty. Gen., St. Paul, for respondent.

## PER CURIAM.

Writ of certiorari upon the relation of United Dressed Beef Corporation to review a decision of the commissioner of employment services (now the commissioner of economic security). The issue is whether claimants should be partially disqualified from receiving unemployment compensation benefits upon the ground that they were discharged for "misconduct" within the meaning of Minn.St.1976, § 268.09, subd. 1(1). The commissioner, reversing the appeal tribunal, held that they were not subject to any disqualification from receiving benefits. We reverse.

The facts are largely undisputed. United processes boneless beef, and claimants had been employed for several years as boners who removed ribs from the "navel," a long section of meat cut from the front quarter of a cow. Although guaranteed a minimum hourly wage, they were paid a piecework rate of 29 cents per navel. Most navels contain 8 ribs, a few have 7, and about 4 percent have 9. Boners develop a rhythm in their work which claimants said is thrown off when the navels contain 9 ribs. Prior to negotiation of a new union contract in August 1976, some navel boners, including claimant John Schultz, had claimed hourly wages for 15 or 30 minutes to compensate for the added time required to bone the 9-rib navels.

When the new contract was being discussed, the union negotiating committee, of which claimants were members, attempted to obtain a higher piecework rate for the 9-rib navels, but Paul Held, Sr., United's president, refused to discuss the matter as "picayune." After the new union contract was negotiated, the navel boners were no longer authorized to add "daywork" time for 9-rib navels. Early in September 1976 claimants decided that when they worked on such navels they would cut the ninth rib off and place it in a barrel so that it could be completely trimmed either by "strip" boners or by employees paid by the hour to trim bones.

On November 17 claimants' supervisor noticed this practice, allegedly for the first time, and asked claimant Lamont Heilman "what those bones were in the barrel." Heilman testified that—

"* * * I explained to him what they were. I felt that I was cutting off the ninth rib, and therefore I was, if nothing else *I was splitting the cost of that ninth rib with the company.* It was costing me something to cut it off, and it cost, him, maybe something to trim it out and this was a split cost." (Italics supplied.)

Paul Held, Sr., who was out of town, was informed of claimants' conduct when he returned to the plant on Monday, November 22. He discussed the matter with claimants and, when they admitted they had begun cutting out the ninth rib in September without obtaining permission to do so, he discharged them for "trying to change his operation" and for dishonesty in taking full credit for 9-rib navels when they had not completed the work on them.

After considering these facts, the commissioner's representative modified the appeal tribunal's findings of fact [1] by adding that 4 percent of the navels on which claimants worked had 9 ribs and by characterizing their conduct in cutting off the ninth rib and leaving it for other employees to trim as "done openly." He concluded that, although claimants had "technically violated the employer's work plan (that they

---

1. See, Minn.St. § 268.10, subd. 5; *Lumpkin v. North Central Airlines, Inc.,* 296 Minn. 456, 209 N.W.2d 397 (1973).

would not be paid extra for the ninth rib),'' their actions did not constitute misconduct within the meaning of Minn.St.1976, § 268.-09, subd. 1.[2]

In *Tilseth v. Midwest Lbr. Co.*, 295 Minn. 372, 374, 204 N.W.2d 644, 646 (1973), we adopted the definition of misconduct enunciated in *Boynton Cab Co. v. Neubeck*, 237 Wis. 249, 259, 296 N.W. 636, 640 (1941):

" * * * [T]he intended meaning of the term 'misconduct' * * * is limited to conduct evincing such wilful or wanton disregard of an employer's interests as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of his employee, or in carelessness or negligence of such degree or recurrence as to manifest equal culpability, wrongful intent or evil design, or to show an intentional and substantial disregard of the employer's interests or of the employee's duties and obligations to his employer. On the other hand mere inefficiency, unsatisfactory conduct, failure in good performance as the result of inability or incapacity, inadvertencies or ordinary negligence in isolated instances, or good-faith errors in judgment or discretion are not to be deemed 'misconduct' * * *."

We have applied this definition in holding claimants partially disqualified for benefits in several subsequent cases. E. g., *Ideker v. LaCrescent Nursing Home*, 296 Minn. 240, 207 N.W.2d 713 (1973); *Blom v. Madsen's Enterprises, Inc.*, 298 Minn. 573, 215 N.W.2d 791 (1974), in which the claimant also refused to perform work within her assigned duties; *Booher v. Transport Clearings, Inc.*, 260 N.W.2d 181 (Minn.1977). In this case also, we are compelled to conclude that claimants' conduct was a significant violation of the standards of behavior their employer had a right to expect of them and that it showed both an intentional and substantial disregard of their employer's interests. Not only did claimants force United

to pay twice for work which they were supposed to do and took credit for doing, but their conduct could easily have led other employees to decide that they also need not perform all of the work assigned to them. Although their actions affected a small percentage of their daily work, the cumulative effect of their conduct was clearly injurious to their employer's interests.

Reversed.

---

2. This section provides in part: "An individual shall be disqualified for benefits:

"(1) If such individual * * * was discharged for misconduct, not amounting to

gross misconduct, connected with his work * * *."